UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY ALEGRE, et al.,<br><br>                            Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; DEPARTMENT OF INTERIOR; BUREAU OF INDIAN AFFAIRS; RYAN ZINKE, Secretary of the Department of Interior, United States of America; MICHAEL BLACK, Acting Assistant Secretary of the Department of Interior - Indian Affairs, United States of America; WELDON LOUDERMILK, Director Bureau of Indian Affairs; AMY DUTSCHKE, Pacific Regional Director, Department of Interior - Indian Affairs, United States of America; JAVIN MOORE, Superintendent of the Department of Interior Indian Affairs, Southern California Agency; DOES 1 through 200, inclusive,<br><br>                            Defendants. | Case No.: 17-CV-0938-AJB-KSC<br><br>**ORDER GRANING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>(Doc. No. 6) |

Plaintiffs, collectively referred to as the Martinez Descendants, seek declaratory relief that their ancestors are full blood San Pasqual Indians and that all Plaintiffs have no less than 1/8 San Pasqual blood, thereby satisfying the Band's enrollment criteria.[1] Currently before the Court is Plaintiffs' ex parte request for temporary restraining order. (Doc. No. 6.) Plaintiffs assert they gave notice to Defendants of their intent to file the instant request. (Doc. No. 6-2 ¶¶ 3–4.) Having considered Plaintiffs' arguments, and for the reasons set forth below, the Court **GRANTS** the request for temporary restraining order and **SCHEDULES** a telephonic status conference for ***Monday, May 22, 2017, at 3:00 p.m.*** to set a briefing schedule and hearing on a motion for preliminary injunction.

## BACKGROUND

This lawsuit centers on a century-old dispute over tribal identity. Plaintiffs' grievances are two pronged. One issue concerns Plaintiffs' ancestry and Defendants' conduct. The other concerns the ancestry of other members of the Band.

### I. *Historical Background and the Trask Descendants*

Plaintiffs' dispute dates back to the late 1800s and early 1900s. After the Band was driven from its aboriginal land, the United States government designated land in another township for the Band. (Doc. No. 1 at 17.)[2] Though the land was filled with rocks and had little or no water, it was still valuable, and squatters remained problematic. (*Id.* at 17–18.) To deal with this issue, Amos Frank, then Indian Superintendent of the Mesa Grande Tribe, hired a man named Frank Trask as a "police private and judge" to preserve the San Pasqual reserve. (*Id.*; Doc. No. 1-2 at 24–25.) Frank Trask was the son of Rosewell Trask, a white man, and Mattiana Martha Warner Trask, a Mexican woman. (Doc. No. 1 at 17.) Frank Trask married Lenora LaChappa, a Mesa Grande Indian woman. (*Id.*) Accordingly, while

---

[1] This is a companion case to 16-CV-2442. All citations are to the docket filings in the instant matter unless otherwise noted.

[2] The Court cites to the blue CM/ECF-generated docket and page numbers located at the top of each page.

Trask descendants have some Indian blood, Plaintiffs allege they have no San Pasqual Indian blood.[3]

Amos Frank relocated Frank Trask and his family onto the San Pasqual reserve in 1910. (*Id.* at 18; *see* Doc. No. 1-15.) Though Frank Trask's employment ended within a year, the Trask family remained on the land as squatters for the next 40 years and prevented the Band from coming onto the reservation. (Doc. No. 1 at 18–19; Doc. No. 1-2 at 25.)

In the 1950s, the Band started to formally organize itself. (Doc. No. 1-2 at 25.) The Band worked with anthropologist Dr. Florence Shipek to assemble the documentation necessary to establish Band membership. (*Id.*) Dr. Shipek worked with the Band's Enrollment Committee, which was then comprised mainly of members who were unquestionably of San Pasqual descent. (*Id.*) However, it also included two members not of San Pasqual descent, including Florence Wolf Trask, the daughter of Frank and Lenora Trask. (Doc. No. 1 at 17; Doc. No. 1-2 at 25–26.)

In or around 1959, the Band approved an enrollment statute, which required that persons seeking enrollment in the Band must possess no less than 1/8 blood of the Band. (Doc. No. 1 at 21; *see* Doc. No. 1-19.) Following the Band's approval of the proposed regulation, and unbeknownst to the Band, the rule that was ultimately codified and published at 25 C.F.R. § 48 on March 2, 1960, differed in a significant respect from that which the Band approved. (Doc. No. 1 at 21–22; Doc. No. 1-2 at 26–27.) The added section, codified at 25 C.F.R. § 48.5(f), read in pertinent part as follows:

> A person who meets the requirements of paragraph (a), (b), or (c) of this section, but whose name has been carried on the census roll of another reservation shall be declared ineligible for enrollment unless he can establish

---

[3] In 1955, the California state legislature held hearings regarding the California Indians, at which Pacific Regional Director Leonard Hill testified that the Trask family is not of San Pasqual descent and could not deprive the Band of its patented land. (Doc. No. 1 at 19–20.) Hill echoed this thought in 1966: "The [BIA] is aware that the members of the only family which has occupied the reservation for many years are not members of the San Pasqual Band." (Doc. No. 1-2 at 30–31.)

that he has been affiliated with the San Pasqual Band for a continuous period of at least one year immediately prior to January 1, 1959, evidenced by residence on the reservation or through active participation in tribal affairs such as attendance at tribal meetings, and being permitted to vote on matters relating to the San Pasqual Reservation.

(Doc. No. 6-11 at 3–4; *see* Doc. No. 1-2 at 26–27.)

After 25 C.F.R. § 48 was published, the Enrollment Committee recommended that several Trask Descendants be denied enrollment. (Doc. No. 1 at 22.) However, the BIA found the Trask Descendants were eligible for enrollment. (*Id.*) In 1966, the BIA had prepared and approved the Tribal Membership Roll of the Band, which included several non-San Pasqual people due to § 48.5(f) and a secretarial construction of the phrase "blood of the Band" as used in the C.F.R. to mean "total Indian blood of a person named on the basic membership Roll dated June 30, 1910." (*Id.*; Doc. No. 1-2 at 23–24.) The Band objected to the use of the 1910 census because it included Frank and Lenora's children, even though Lenora and her parents were listed on multiple census rolls for the Mesa Grande Tribe. (Doc. No. 1-2 at 26, 29.) These actions and interpretations resulted in the admission of Trask Descendants to the Band. (*Id.* at 28–30.)

## II. *Plaintiffs' Denial of Enrollment in the 2000s*

Plaintiffs are the descendants of Jose Juan Martinez, Guadalupe Martinez, and their daughter Modesta Martinez Contreras. (Doc. No. 1 at 9.) On September 12, 2005, the Band's Tribal Counsel and Enrollment Committee approved Plaintiffs for enrollment in the Band. (*Id.* at 10; Case No. 16-CV-2442, Doc. No. 13-3 at 14–15, *see* Doc. No. 13-10.) Ten days later, the Enrollment Committee submitted a letter to Superintendent James Fletcher of the Bureau of Indian Affairs ("BIA"), requesting that the BIA correct Modesta Martinez Contreras's blood degree from 3/4 to 4/4 degree San Pasqual blood. (Doc. No. 1 at 10–11.)[4]

---

[4] The Enrollment Committee now is not comprised of the same individuals as the Committee that approved Plaintiffs' enrollment applications. Plaintiffs allege that in or

4

17-CV-0938-AJB-KSC

The BIA did not respond to this letter until December 8, 2005. (*Id.* at 11.) In its response, the BIA stated "the preponderance of the evidence does not sufficiently demonstrate that Modesta (Martinez) Contreras is full blood." (*Id.*; Doc. No. 1-10 at 3.) The letter was sent only to the Pacific Regional Director, Amy Dutschke. (Doc. No. 1 at 12; Doc. No. 1-10 at 2.) Plaintiffs and the Tribe were not sent the letter. (Doc. No. 1 at 12.) On January 31, 2006, Dutschke concurred with the BIA that Contreras was not a full blood San Pasqual Indian. (*Id.*) 25 C.F.R. § 48.9 required Dutschke to provide Plaintiffs with notification of this determination, but she did not. (*Id.* at 12–13.) Plaintiffs assert that between 2005 and the present, they were never provided written notice of the BIA's and Dutschke's determination. (*Id.* at 13; Case No. 16-CV-2442, Doc. No. 13-3 at 18–19.)

On or about October 1, 2014, Plaintiffs filed a request pursuant to the Freedom of Information Act to ascertain the status of their applications. Sometime between December 8, 2014, and January 1, 2015, in response to the FOIA request, the letter of denial dated April 7, 2006, was finally produced to Plaintiffs. (Doc. No. 1 at 16.) The amended complaint in 16-CV-2442 deals with Defendants' failures to provide Plaintiffs with notice of the denial of their applications, as well as the underlying determination that Modesta Martinez Contreras is not a full blood San Pasqual Indian.

### III. *Present Day Issues Between Trask Descendants and Plaintiffs*

Presently, there are several Trask Descendants in positions of power within the Band, including the Enrollment Committee. (*Id.* at 23.) Plaintiffs' filing of the complaint in 16-CV-2442 has only exacerbated tensions between the Trask Descendants and Plaintiffs. On April 9, 2017, a General Council meeting took place on the reservation where the Trask Descendants moved to implement a moratorium on enrollment until a new enrollment ordinance can be put in place. (Doc. No. 1 at 24; Doc. No. 1-2 at 36–37; Doc.

---

around January 2006, the Trask Descendants "wrongfully dismissed the Constitutionally installed Enrollment Committee[] and installed an illegal Enrollment Committee," which Trask Descendants now head. (Case No. 16-CV-2442, Doc. No. 13-3 at 23.)

No. 6-5 ¶¶ 2, 5.) Plaintiffs assert the new ordinance will remove federal government oversight of the enrollment process. (Doc. No. 1-2 at 34.) Plaintiffs fear that if this occurs, the Trask Descendants can take action to deny Plaintiffs enrollment and/or disenroll those already enrolled in the Tribe.[5] (*Id.* at 34, 37.) Should such occur, Plaintiffs will have no recourse with the U.S. government or the courts. (*Id.*)

On May 8, 2017, Plaintiffs instituted the instant action, seeking injunctive relief to prevent Defendants from taking any action to approve any proposed changes to the San Pasqual Constitution and/or enrollment procedures. (Doc. No. 1; Doc. No. 1-2 at 32.) Plaintiffs filed the instant ex parte request for temporary restraining order ("TRO") on May 16, 2017. (Doc. No. 6.)

## **LEGAL STANDARD**

A temporary restraining order is a form of preliminary injunctive relief. Its sole purpose is to preserve the status quo pending hearing on the moving party's application for a preliminary injunction. *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 7*, 415 U.S. 423, 439 (1974); *Guajardo v. Mukasey*, No. C 08-1929 PJH, 2008 WL 1734517, at *1 (N.D. Cal. Apr. 11, 2008). "Status quo" means "the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).

A preliminary injunction is an "extraordinary remedy" and is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). To obtain this relief, the moving party bears the burden of demonstrating four factors: (1) likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in

---

[5] Twenty-two of Plaintiffs' cousins, who were also approved for enrollment by the Tribe on April 22, 2005, were enrolled in the Tribe. (Case. No. 16-CV-2442, Doc. No. 13-3 at 21.)

the moving party's favor; and (4) "an injunction is in the public interest." *Id.* at 20.

Although a plaintiff must satisfy all four of the *Winter* requirements, the Ninth Circuit employs a sliding scale whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Accordingly, if the moving party can demonstrate the requisite likelihood of irreparable harm and show that an injunction is in the public interest, a TRO may issue so long as there are serious questions going to the merits and the balance of hardships tips sharply in the moving party's favor. *Id.*

## DISCUSSION

In this case, Plaintiffs contend they will be irreparably harmed if Defendants take action to affirm any proposed changes to the Band's Constitution and enrollment criteria. Should Defendants do so, federal government review of enrollment into, and disenrollment from, the Band will be removed. This would leave the Martinez Descendants with no recourse should they be improperly disenrolled from, or improperly blocked from enrolling in, the Band. This is sufficient to establish a likelihood of irreparable harm. *Alto v. Salazar*, No. 11cv2276-IEG (BLM), 2011 WL 4591944, at *1 (S.D. Cal. Oct. 4, 2011) (finding plaintiffs alleged they would be "irreparably harmed if the San Pasqual Tribe is allowed to amend the Tribe's Constitution without their participation" because it would result in them "forever [being] precluded from enrollment, irrespective of their lineage and the proof provided").

For this reason, Plaintiffs have established that the balance of hardships tips sharply in their favor, at least at this stage of the litigation. If the Court does not grant a TRO, Plaintiffs may forever face preclusion from enrollment. On the other hand, any harm to Defendants or the Band is negligible. If Defendants ultimately prevail on this action and its companion case, Defendants can then affirm, should they choose to, any changes to the Band's Constitution and enrollment procedures that the Band promulgates.

//

Furthermore, Plaintiffs have demonstrated that, at the very least, there are serious questions going to the merits. For example, Plaintiffs allege Defendants failed to follow the procedures set forth in 25 C.F.R. § 48.9, which required them to provide Plaintiffs with written notice of the enrollment denial within thirty days. (Doc. No. 1 at 12–13.) Without such notice, Plaintiffs contend they were denied due process of law, as they could not appeal a denial about which they were unaware. Plaintiffs further contend they were deprived of their property interest in federal housing grants and education and per capita payments, among other things. (Case. No. 16-CV-2442, Doc. No. 13-3 at 22, Doc. No. 13-4 at 44.) *See Parks v. Watson*, 716 F.2d 646, 656 (9th Cir. 1983).

Plaintiffs also allege they have documentation establishing that their ancestors are full blood San Pasqual Indians, which they allege the BIA arbitrarily disregarded in denying their applications. (Case No. 16-CV-2442, Doc. No. 13-3 at 2–4.) The Court finds these contentions sufficient to create serious questions going to the merits of Plaintiffs' claims. *Alto*, 2011 WL 4591944, at *2 (finding serious questions going to the merits existed where plaintiffs alleged that Assistant Secretary Hawk "failed to consider all of the relevant factors, ignored some factors while giving substantial weigh[t] to others, and failed to articulate a rational connection between the facts found and the conclusions made" (citing *Latino Issues Forum v. U.S. E.P.A.*, 558 F.3d 936, 941 (9th Cir. 2009); *Envtl. Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 858 n.36 (9th Cir. 2003))).

Finally, there does not appear to be any "critical public interest" that would be injured by granting a TRO and setting the case for a hearing on whether a preliminary injunction should be granted. *See Alliance for the Wild Rockies*, 632 F.3d at 1138; *Alto*, 2011 WL 4591944, at *2.

## CONCLUSION

In sum, because Plaintiffs have demonstrated they are likely to be irreparably harmed if a TRO is not issued and the balance of hardships tips sharply in their favor, and because there are serious questions going to the merits of Plaintiffs' claims, the Court **GRANTS** their request for temporary restraining order. Defendants are hereby

8

**RESTRAINED** and **ENJOINED** from taking any action to affirm any proposed changes to the San Pasqual Band's Constitution and/or enrollment criteria and/or procedures until the Court rules on the propriety of a preliminary injunction. Plaintiff's counsel is **ORDERED** to serve a copy of the request for TRO and this order on Defendants forthwith.

Furthermore, the Court sets a telephonic status conference on *__Monday, May 22, 2017, at 3:00 p.m.__* to discuss a briefing schedule and hearing on a motion for preliminary injunction. Plaintiff's counsel is **ORDERED** to contact Defendants and coordinate the conference call. Plaintiff's counsel *must* email the call-in information to the Court at efile_battaglia@casd.uscourts.gov no later than 5:00 p.m. on Friday, May 19, 2017.

**IT IS SO ORDERED.**

Dated: May 18, 2017

Hon. Anthony J. Battaglia
United States District Judge